UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | : | Case No. 1:14-CR-122 |
| Plaintiff, | : | |
| vs. | : | |
| Eric Lusenhop, | : | |
| Defendant. | : | |

**ORDER**

Defendant, Eric Lusenhop, filed three pre-trial motions to suppress evidence in this case. The motions are: (1) a motion to suppress an out-of-court identification of Defendant based on a photographic array (Doc. 16); (2) a motion to suppress evidence seized pursuant to a search warrant issued to Cincinnati Bell for records concerning Defendant's cell phone (Doc. 17); and (3) a motion to exclude certain video and photographic evidence obtained from a video recording system used by the gas station where the crime took place (Doc. 18). The United States filed written responses to each motion (Docs. 19, 20, and 21). During a hearing held on March 16, the parties submitted for decision the motion regarding the cell phone records warrant, and the Court issued an order on March 25 denying that motion. (See Doc. 27) At that hearing, Defendant also raised arguments regarding the photo array that were not presented in his written motion. The Government objected to the lack of notice about these new issues. The Court continued the hearing and granted Defendant's request to file a supplemental motion in support. The supplemental motion was filed (Doc. 25), and the Government filed its supplemental response (Doc. 28).

On March 31, 2015, the Court reconvened the hearing regarding Defendant's pending motions.

(1) Motion to Suppress Photographic identification (Docs.16, 25).

Defendant seeks to suppress testimony from the victim of the crime, who identified him as the perpetrator based upon a photo array the victim saw at the Forest Park police station.  Defendant argues that the circumstances surrounding the photo array and the victim's identification were unduly suggestive.

Identification testimony must be excluded (and any resulting conviction aside) if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968).  Defendant bears the burden of demonstrating that the pretrial identification procedure was impermissibly suggestive. United States v. Hill, 967 F.2d 226, 230 (6th Cir. 1992).

A two-step analysis applies in determining the admissibility of the identification testimony.  First, the Court must decide if the procedure used was unduly or impermissibly suggestive. "This is a fact-specific determination, and the court may consider 'the size of the [photographic] array, the manner of its presentation by the officers, and the details of the photographs themselves.'" United States v. McComb, 249 Fed. Appx. 429 (6th Cir. 2007)(quoting United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994)).  This inquiry probes whether "the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection." Cornwell v. Bradshaw, 559 F.3d 398, 413 (6th Cir. 2009).  The Supreme Court has given examples of impermissibly suggestive lineup procedures, including ones where  "... all in the

lineup but the suspect were known to the identifying witness, that the other participants in a lineup were grossly dissimilar in appearance to the suspect, that only the suspect was required to wear distinctive clothing which the culprit allegedly wore, that the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, that the suspect is pointed out before or during a lineup, and that the participants in the lineup are asked to try on an article of clothing which fits only the suspect." United States v. Wade, 388 U.S. 218, 232-33 (1967).

If the Court concludes that the identification procedure was unduly suggestive, it must then determine whether the totality of the circumstances renders the identification reliable despite that finding. In making this second analysis, the Supreme Court has articulated relevant factors that the Court should consider: "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson v. Brathwaite, 432 U.S. 98, 114 (1977)(citing Neil v. Biggers, 409 U.S. 188, 198-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)).

Based upon Defendant's motion and supplemental memorandum, the Court agreed with the Government's contention that he has not carried his burden of showing that the photo array was unduly suggestive. Defendant simply speculates that the array was not prepared objectively, that the victim had prior contact with the Defendant, or that police officers suggested to the victim before he identified the Defendant that a suspect was in custody. While the Court was inclined to deny an evidentiary hearing

altogether, out of an abundance of caution the Court permitted Defendant to present evidence on the issue of undue suggestiveness only.

Three Forest Park police officers testified about the photo array. Officer Rebecca Eavers, with the Forest Park police department, is a patrol officer. She was not involved in the investigation of the carjacking, and she was on duty one day when another officer asked her to present a photo lineup to a crime victim. The officer handed her a folder, and she met the victim (Norman Williams) in a small room at the police department. She explained the procedure by reading instructions to Williams, which are contained in Government Exhibit 1. She then showed him six photos, and Williams immediately said "That's him", "Yep that's him," "100%." Williams identified the photo in the upper left corner of the photo array marked as number 1 on Government's Exhibit 3. Williams circled that photo. Eavers described Williams' response to the photo as "immediate" with "no hesitation," stating that Williams "put his finger" on Defendant's photo. She put the papers back into the folder, told Williams that the detective would talk to him, and she left. She did not know Defendant prior to the photo array and did not know any of the other individuals pictured there.

Detective Crowley was involved in the investigation in this matter, and he testified that he prepared the photo array by accessing a database of photos available to law enforcement officers, called the Ohio LE Gateway. This database includes photos from the Bureau of Motor Vehicles as well as jail facilities. The photos used in the array in this case were obtained from driver's license files because they all have a light or blue background. Crowley described photos taken in jail facilities as having red or yellow backgrounds. Crowley did not interview Williams before he prepared the array, and

relied upon Williams' description of the perpetrator that he gave to a responding officer the night of the carjacking. Crowley input Williams' physical description into the database, and a "line-up wizard" automatically uploads photos that match the description. Crowley then chooses the photos to use in the array. Crowley did not speak to Williams before he reviewed the photos; afterward, Crowley met with Williams and told him he "picked the right guy." Williams told Crowley that he got a "good look" at the perpetrator's eyes the night of the crime.

Detective Hall was the primary investigator in this case. He did not assist with the photo array, but he called Williams on the telephone and asked him to come down to the station to see a lineup that was made by another officer. Hall did not recall telling Williams that they had a suspect at that time.

Finally, the victim, Norman Williams, testified about his recollection of the photo lineup. Williams thought he saw the photos about a week after the crime. He recalled that an officer called him once before, telling him that the police "had a lead" based on tips that were received from Crimestoppers. The phone call with Det. Hall about the lineup was very brief, and Williams went to the station that day. Williams recalled that he was shown six or seven photographs, which were displayed on separate pages. He also recalled that there were three on top and three on the bottom, as Officer Eavers laid the photos on the table. He stopped her immediately upon seeing Defendant's photo, which he recalled was photo #3. Eavers told him to stop because he had to look at all the photos. He did so, but he again identified Defendant as the perpetrator. He recalled circling that photo or somehow indicating in writing the photo he chose. Government's Exhibit 3 is a copy of the lineup array with a circle drawn around

Defendant's photo, which Eavers testified was placed there by Williams.  Williams did not recall talking to a detective after he saw the photos.  He did not know Defendant prior to this incident, and he denied seeing Defendant's photo on local news coverage immediately after the crime.

In the Court's opinion, the different description given by Officer Eavers and Mr. Williams of the particular method he was shown the photographs is an immaterial factual dispute.  Whether Williams saw six photographs on a single page (as displayed in Government's Exhibits 2 and 3), or six photographs on separate pages in two rows of three, he and Officer Eavers testified that as soon as Williams saw Defendant's photo, he unhesitatingly identified him as the perpetrator of the crime.  According to Officer Dreyer's initial report cited in Defendant's motion, Williams described the perpetrator as about 6 feet 3 inches tall, slim, light complexion, "shadowy" beard, between 23 and 30 years old, a scar of some sort on his cheek, and a "small afro that the skull cap was shaped around."  (Doc. 25 at p. 4)   Defendant argues that his photo in the array (in position #1 in Government's Exhibit 3)  is the only one of an individual that could wear a skull cap around "a small afro."  At least three of the men in the other photos have hair that could be described as a "small afro."  A "skull cap" could cover all six of the individual's hairstyles.  Defendant also notes that the photos have different backgrounds, and that Defendant has "distinctive eyebrows" unlike those of the men in the other photos.  The Court finds that the backgrounds of the photos do not materially differ.  They all have backgrounds in varying shades of white or blue, and Defendant's photo is not unfairly highlighted.  Mr. Williams did not describe the perpetrator's eyebrows in any way to Officer Dreyer, and all of the men in the six photographs have

-6-

eyebrows of varying shapes and distinctiveness. In any event, minor variations in photo backgrounds, the placement of a defendant's photo in a particular position, or variations in facial expressions (such as closed eyes, smiles or frowns, or showing teeth) do not render an objectively created photo display unduly suggestive. See United States v. McComb, 249 Fed. Appx. 429, 440 (6th Cir. 2007), and cases cited therein. Williams immediately identified Defendant, and was "100%" certain of his identification.

Based upon all of the evidence and testimony, the Court finds that the photo array that was shown to Mr. Williams, and the circumstances surrounding its creation and his viewing of it, were not **unduly** suggestive. The Court therefore denies Defendant's motion to suppress the photo identification.

(2) Video and Photographic evidence obtained from surveillance tapes (Doc. 18).

The carjacking occurred at a gas station, which had a surveillance recording system. According to Defendant's motion, Officer Hoy interviewed the owner of the station the night of the carjacking, and wanted to obtain a copy of the footage. The owner told Officer Hoy that the system was outdated and it was difficult to copy footage from the system to a CD. He also told the police that the recordings were preserved for only ten days, after which the system re-recorded over existing footage. The original of the entire surveillance video from the evening of the crime is no longer available.

Detective Hall testified at the hearing that he went to the station the next day, and the owner played the surveillance video on a screen at the station. It was not very good quality, and he was unable to copy or download the tapes onto any kind of digital media. The viewing method used by the owner displayed up to twelve different camera shots on one screen. Detective Hall described a rather laborious procedure of stopping the

tape, focusing on one camera angle, and then watching and in some cases taking photographs of various images captured on several of the cameras. Many of the images could not be seen due to poor quality, blurry or indistinct images, and dark conditions outside the station. Detective Hall videotaped approximately one minute which showed the carjacking taking place, but that excerpt does not include a clear image of the perpetrator's face. He also took still photographs of views inside the station that night, including photos of the Defendant, the "second suspect," the counter clerk, and Mr. Williams. Hall saw video of Williams inside, the suspect inside placing some money on the counter over Williams' shoulder, and some talking among the clerk, the suspect and Williams. (The videotapes had no sound track.) Hall did not copy this portion of the tape, and did not take any notes of his viewing the video.

Detective Hall's written report states that he saw the "main suspect" drop a paper receipt during the altercation with Mr. Williams. Hall saw "a second suspect who was driving the dark Magnum in which the suspect arrived. The video showed the unidentified driver (suspect 2) inside the store and he appeared to be friends with a heavy set male black with long dreads." (Doc. 18 at p. 2)

Defendant argues that the excerpt of the video should be suppressed. Detective Hall had the ability and the opportunity to record all of the surveillance video he was able to view at the station, but chose not to do so because it would have taken so much time. Defendant cites United States v. Gravley, 587 Fed. Appx. 899 (6th Cir. 2014), where the defendant was charged and convicted by a jury of murdering Peterson, a fellow inmate at the Big Sandy penitentiary. Other inmates complained that the prison guards deliberately placed Peterson into Gravley's cell, because they knew he was in a

rival gang and because Peterson had caused trouble for several corrections officers. This led to a special DOJ/OIG investigation, which cleared prison officials of intentional misconduct, but cited several officers for negligence and dereliction of duty. During that investigation, the warden and an OIG special agent reviewed some 19 hours of surveillance video taken of the prison's corridors in the vicinity of the murder. Defendant later asked for the entirety of the video, but for unclear reasons only 27 minutes remained (the rest had been overwritten in the interim). Defendant moved to dismiss the charges, alleging the film had been intentionally destroyed. The district court denied the motion, noting that the warden and OIG agent reviewed the entirety of the footage, and had asked BOP to save it. The warden also made a timeline of events viewed on the footage. The Sixth Circuit affirmed the district court's conclusions that defendant failed to show that the missing footage was materially exculpatory, or that it was overwritten in bad faith. The defendant also failed to show that comparable evidence to the video footage was unavailable, because the warden prepared a timeline of events shown on the video footage.

Defendant argues that the safeguards used in that case were not followed here. Only Detective Hall viewed the entirety of the surveillance video, and he did not prepare a specific timeline of events he witnessed. His written report is a "short, one paragraph summary of what he saw." Detective Hall noted two suspects, but there is no video of any interaction between the two suspects. The station owner told the police that the video would not be preserved on its system, putting them on notice that they should take additional steps to preserve the entirety of the footage.

The Government responds that Defendant has no evidence that any of the

missing footage contained materially exculpatory evidence. The Government notes that in Gravley, the defendant was charged with conspiracy to commit murder; the missing 19-hour video was taken in the corridors around the cell in which the inmate was killed. Here, in contrast, Defendant is charged with car-jacking. That crime took less than two minutes, was committed by one perpetrator, and was captured on the preserved video. The Supreme Court has clearly held that the government officials' failure to preserve "potentially exculpatory evidence" does not give rise to a constitutional violation, so long as they do not destroy evidence in an intentional effort to avoid Brady's disclosure requirements, if they act in good faith, and there is no suggestion of any official animus toward the defendant. Trombetta, 467 U.S. at 488. Defendant has not identified any material, exculpatory evidence that he believes might have existed on the videotape. He suggests that additional videotape showing him and the other individuals in the gas station or moving around the premises might raise some doubt about his identity. But this speculation is not sufficient to satisfy his burden of demonstrating some reasonable basis to believe that exculpatory evidence was destroyed.

Even if the Court assumes that Defendant could show that some material exculpatory evidence might have been on the unpreserved video, Defendant must also show that the United States destroyed the original video in bad faith. Illinois v. Fisher, 540 U.S. 544, 547-548 (2004); United States v. Generett, 149 Fed. Appx. 432, 435 (6th Cir., Sept. 7, 2005). The Supreme Court observed that the bad faith requirement was specifically adopted to in order to limit "... the extent of the police's obligation to preserve evidence to reasonable grounds and confin[e] it to that class of cases where the interests of justice most clearly require it." Illinois v. Fisher, 540 U.S. at 548, quoting

Arizona v. Youngblood, 488 U.S. 51, 58 (1988). There is nothing in Defendant's motion or in the hearing testimony that gives rise to any suggestion that Detective Hall, or any other police officer, deliberately allowed the rest of the surveillance video to be destroyed. There is no suggestion of any official animus toward the Defendant that might have motivated such deliberate misconduct. Nor can the Court conclude that Detective Hall was aware of, or should have appreciated the existence of any exculpatory evidence on the video he viewed. There is simply no reasonable inference of bad faith conduct that arises from the record before the Court.

During the hearing, Defendant cited United States v. Zaragoza-Moreira, 2015 U.S. App. LEXIS 4320 (9th Cir., March 18, 2015), a recent decision in which the Ninth Circuit held that the government's failure to preserve videotape evidence violated the defendant's due process rights. In that case, the defendant was entering the United States from Mexico, and when she displayed her passport she was put in a secondary inspection line. There, a border agent started a pat-down and she immediately confessed to having "packages" taped to her body. The packages contained illegal drugs, and the defendant was interviewed for over an hour by an investigator. The interview was videotaped. Defendant told the agent that she has been coerced into bringing the drugs into the country, and provided significant details about her experience and the people who forced her to travel with the drugs.

A criminal complaint was filed the next day, and five days later her attorney wrote to the U.S. attorney, asking for preservation of the border interview videotape. Defendant was indicted about eight weeks later, and she promptly filed a motion to compel discovery and to preserve the video recording. The district court ordered the

government to preserve it, and the AUSA contacted Border Protection the next day. However, Border Protection had already destroyed the videotape by automatically recording over the tape about a month prior to the court's order.

The Ninth Circuit held that the exculpatory value of the video was readily apparent to the border investigator at the time she interviewed the defendant. While the agent testified that she simply "overlooked" preserving the video, she clearly recognized the importance of the defendant's story at the time of that interview based on the number of questions she asked of defendant about the individuals who were coercing her. Of even greater concern was the fact that the agent's probable cause statement to support the initial criminal complaint omitted all references to the defendant's claims of duress and the facts she relayed to the agent during that interview. The agent also conducted a subsequent investigation of defendant's story, which confirmed her statements about being accompanied by another woman when she approached the border. Moreover, the Ninth Circuit noted that the U.S. attorney did nothing to try to preserve the video after receiving a specific request to do so from defense counsel.

The facts of that case distinguish it from the situation before the Court. Defendant has not asserted a defense of any kind that is similar to that raised by the defendant in Zaragoza-Moreira, and the videotape in that case was unquestionably material to establishing the defendant's claim of duress, and her description of being forced to bring the drugs into the country. Here, Detective Hall was investigating an aggravated robbery committed by an unknown suspect that involved the suspect firing a gun at the victim. He reviewed the surveillance tapes, made a copy of the crime being committed, and took a series of still photographs depicting individuals present at the

-12-

station.  Defendant has been charged with carjacking, and knowingly carrying, using and discharging a firearm during that crime of violence.  The copy of the video that Detective Hall preserved shows these crimes being committed by one person, while they occurred.  Defendant has not articulated any basis upon which the Court could conclude that video inside the store would be material and exculpatory, much less that Detective Hall knew that the rest of the videotape contained exculpatory evidence.  For these reasons, the Court finds that Defendant's motion to suppress the video excerpt will be denied.

During the hearing, Defendant alternatively asked the Court to consider suppressing the still photographs taken by Detective Hall if the Court was not inclined to exclude the video excerpt.   The Government will submit to the Court for its review a set of the still photographs taken by Detective Hall, as he described in his testimony.  The Court will issue a further ruling on suppressing the photos after they have been reviewed.

## CONCLUSION

For all of the foregoing reasons, Defendant's motion to suppress identification (Docs. 16, 25) is denied.  Defendant's motion to suppress the video excerpt (Doc. 18) is denied, and the motion with respect to the still photos is taken under submission.

SO ORDERED.

DATED: April 1, 2015                              s/Sandra S. Beckwith
                                                  Sandra S. Beckwith, Senior Judge
                                                  United States District Court